UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

LESLIE JAMES PICKERING,

    Plaintiff,

    v.

CENTRAL INTELLIGENCE AGENCY,

    Defendant.

24-CV-00081-LJV-MJR

# MEMORANDUM OF LAW IN SUPPORT OF
# DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This case arises from Plaintiff's Freedom of Information Act (FOIA) request directed to defendant Central Intelligence Agency (CIA, the "Defendant," or "the Agency"). The CIA conducted a thorough search that was reasonably calculated to locate records that would reflect an unclassified or otherwise openly acknowledged affiliation between the CIA and Plaintiff. No responsive records were found.

For records that would reveal a classified connection between the CIA and Plaintiff, the CIA has determined that the existence or nonexistence of such records is itself a currently and properly classified fact, and as a result, the only appropriate response is for the CIA to neither confirm nor deny the existence of such records under 5 U.S.C. §§ 552(b)(1) and (b)(3) (FOIA "Exemptions 1 and 3"), and 5 U.S.C. §§ 552a(j)(1) and (k)(1) ("Privacy Act Exemptions (j)(1) and (k)(1)"). Defendant therefore respectfully moves the Court to grant summary judgment, pursuant to Federal Rule of Civil Procedure ("Rule") 56, on all of Plaintiff's claims.

## PROCEDURAL HISTORY

Plaintiff's Complaint concerns his request, dated November 11, 2022, under FOIA to the CIA seeking copies of records pertaining to himself. Cmplt. at ¶ 5. By letter dated November 17, 2022, the CIA acknowledged receipt of Plaintiff's FOIA request and assigned reference number P-2023-00114 to the matter. Declaration of Mary C. Williams ("Williams Dec.") at ¶ 8 and Ex. B.

By letter dated May 1, 2023, the CIA provided a final response to Plaintiff's FOIA request. The CIA explained that after conducting a search reasonably calculated to uncover all relevant documents, the CIA "did not locate any responsive records that would reveal a publicly acknowledged affiliation with the CIA." For records that would reveal a classified association between the CIA and Plaintiff, the CIA responded that it could neither confirm nor deny the existence of such records pursuant to FOIA Exemptions 1 and 3, and Privacy Act Exemptions (j)(1) and (k)(1).[1] Williams Dec. at ¶ 9.

By letter dated May 23, 2023, Plaintiff submitted an administrative appeal to the CIA, challenging the CIA's *Glomar* response. Williams Dec. at ¶ 10. The CIA received Plaintiff's administrative appeal but did not respond with a letter acknowledging receipt of Plaintiff's administrative appeal. *Id.* at ¶ 11. By letter dated October 23, 2023, Plaintiff inquired about the status of his administrative appeal. *Id.* at ¶ 12.

Plaintiff filed this lawsuit on January 23, 2024. ECF No. 1. The CIA filed an Answer on February 23, 2024. ECF No. 6.

---

[1] The CIA uses this response, commonly referred to as a *Glomar* response, when the mere fact of the existence or nonexistence of requested records is classified or protected by statute. Williams Dec. ¶ 9.

# FACTS

Defendant incorporates herein the attached Defendant's Statement of Material Facts to Which There is No Genuine Issue.

# STANDARDS OF REVIEW

## I. Summary Judgment in FOIA Cases

"Summary judgment is the usual means by which a court resolves a challenge to a government agency's FOIA response, including one that takes the form of a *Glomar* response." *Am. Civil Liberties Union v. Dep't of Defense*, 322 F. Supp.3d 464, 473 (S.D.N.Y. 2018) ("*ACLU*") (citing *Johnson v. CIA*, No. 17 CIV. 1928 (CM), 2018 WL 833940, at *2 (S.D.N.Y. Jan. 30, 2018); *Am. Civil Liberties Union v. CIA*, 710 F.3d 422, 425 (D.C. Cir. 2013) (Garland, C.J.); *Wilner v. Nat'l Sec. Agency*, 592 F.3d 60, 69 (2d Cir. 2009); *Wolf v. CIA*, 473 F.3d 370, 372 (D.C. Cir. 2007)). "As with all motions for summary judgment, summary judgment in a FOIA case is appropriate only when the . . . materials submitted to the Court show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Eberg v. U.S. Dep't of Def.*, 193 F. Supp.3d 95, 107 (D. Conn. 2016) (quoting *Serv. Women's Action Network v. Dep't of Def.*, 888 F. Supp.2d 231, 240 (D. Conn. 2012)).

"In order to prevail on a motion for summary judgment in a FOIA case, the defending agency has the burden of showing that its search was adequate and that any withheld documents fall within an exemption to FOIA." *Carney v. United States Dep't of Justice*, 19 F.3d 807, 812 (2d Cir. 1994). To sustain that burden, the agency may rely on "[a]ffidavits or declarations supplying facts indicating that the agency has conducted a thorough search and

giving reasonably detailed explanations why any withheld documents fall within an exemption." *Id*.

**II.     *Glomar* Responses to FOIA Requests**

"An agency issues what is known as a *Glomar* response in response to a FOIA request when it refuses to confirm or deny the existence of responsive records on the ground that even to acknowledge records' existence itself would cause the harm underlying a FOIA exception." *ACLU*, 322 F. Supp.3d at 473 (citing *Gardels v. CIA*, 689 F.2d 1100, 1102-03 (D.C. Cir. 1982); *Wolf*, 473 F.3d at 374)). "The *Glomar* doctrine has its origins in a 1976 case before the United States Court of Appeals for the District of Columbia, *Phillippi v. CIA*, 546 F.2d 1009 (D.C. Cir. 1976), in which the CIA refused to respond to a FOIA request pertaining to the oceanic research ship the Hughes Glomar Explorer. The CIA based its refusal on the ground 'that, in the interest of national security, involvement by the U.S. government in the activities which are the subject matter of [plaintiff's]request [could] neither be confirmed or denied.'" *ACLU*, 322 F. Supp.3d at 473-74 (quoting *Phillippi*, 546 F.2d at 1012). "The *Glomar* doctrine is in large measure a judicial construct, an interpretation of FOIA exemptions that flows from their purpose rather than their express language." *ACLU*, 322 F. Supp.3d at 474 (quoting *Am. Civil Liberties Union v. CIA*, 710 F.3d at 431)).

In *Wilner*, the Second Circuit confirmed that it, like the D.C. Circuit, recognizes the viability of a *Glomar* response where factually justified. 592 F.3d at 68-69. The Second Circuit explained that an agency may properly invoke the *Glomar* doctrine and "refuse to confirm or deny the existence of certain records . . . if [a] FOIA exemption would itself preclude the *acknowledgement* of such documents." *Am. Civil Liberties Union v. Dep't of Defense*, 752 F. Supp.2d 361, 364 (S.D.N.Y. 2010) (quoting *Wilner*, 592 F.3d at 68 (emphasis in original)).

"The agency 'resisting disclosure' of the requested records 'has the burden of proving the applicability of an exemption.'" *Id*. "The agency may meet its burden by submitting a detailed affidavit showing that the information logically falls within the claimed exemptions." *Wilner*, 592 F.3d at 68. "In evaluating an agency's *Glomar* response, a court must accord 'substantial weight' to the agency's affidavits, 'provided [that] the justifications for nondisclosure are not controverted by contrary evidence in the record of by evidence of . . . bad faith.'" *Id*. (quoting *Minier v. CIA*, 88 F.3d 796, 800 (9th Cir. 1996)).

## ARGUMENT

The CIA conducted a thorough search that was reasonably calculated to locate records that would reflect an *unclassified* or otherwise openly acknowledged affiliation between the CIA and Plaintiff. No responsive records were found. For records that would reveal a classified connection between the CIA and Plaintiff, the CIA determined that the existence or nonexistence of such records is itself a currently and properly classified fact, and as a result, the only appropriate response is for the CIA to neither confirm nor deny the existence of such records under FOIA Exemptions 1 and 3, and Privacy Act Exemptions (j)(1) and (k)(1).

**I. THE CIA CONDUCTED A LIMITED SEARCH, OF ITS OWN VOLITION, FOR RECORDS BUT WAS NOT REQUIRED TO DO SO IN LIGHT OF ITS *GLOMAR* RESPONSE.**

Plaintiff alleges, in conclusory fashion, that "the CIA failed to conduct an adequate search for responsive records and has wrongfully withheld the sought-after information from plaintiff." Cmplt. at ¶ 13. However, "to the extent the circumstances justify a *Glomar* response, the agency need not conduct any search for responsive documents or perform any analysis to identify segregable portions of such documents." *Lindsey v. FBI*, 490 F. Supp.3d 1, 10 (D.D.C.

2020) (quoting "*People for the Ethical Treatment of Animals v. NIH*, 745 F.3d 535, 540 (D.C. Cir. 2014)).

Still, the CIA conducted a search, of its own volition, for records responsive to Plaintiff's request that was limited to records that would reveal an open, unclassified, or officially acknowledged affiliation or relationship between the CIA and Plaintiff. Williams Dec. at ¶ 14. This "narrowing of the search was appropriate in light of Defendant's . . . *Glomar* response." *See Lindsey*, 490 F. Supp.3d at 24. The CIA information management professionals who conducted the search have access to pertinent records; are knowledgeable about the Agency's records systems and are qualified to search those records systems; and regularly search those records systems in the course of their professional duties. Williams Dec. at ¶ 14.

The CIA information management professionals who processed Plaintiff's request conducted a thorough and diligent search of the relevant systems of records that was reasonably calculated to locate responsive records that might reflect an unclassified or otherwise openly acknowledged relationship between the CIA and Plaintiff. Given the age and type of records requested, the Agency employees searched for responsive documents in several records systems that were deemed reasonably likely to contain responsive records, should those records exist. Those systems include: (1) a system containing electronic versions of all Agency records that have been reviewed and/or compiled for potential public release; (2) multiple systems containing information regarding personnel affiliated with the CIA; and (3) a system containing security records. *Id.* at ¶ 15.

The CIA's search was scoped based on the terms and date parameters specified in Plaintiff's FOIA request. As requested by Plaintiff, the CIA information management professionals conducted a search for the term "Leslie Pickering." The Agency employees also

used biographical data provided by Plaintiff in their search, including his Social Security number. *Id.* at ¶ 16. As stated in the CIA's May1, 2023, final response, the search did not yield any responsive records that would reveal a publicly acknowledged affiliation between the CIA and Plaintiff. *Id.* at ¶ 17.

Following the filing of this action, information management professionals analyzed the initial search and determined that it was reasonably calculated to uncover all records responsive to Plaintiff's request. *Id.* at ¶ 18. With regard to any records responsive to Plaintiff's FOIA request that would reveal a classified or unacknowledged connection to the CIA, the Agency invoked a *Glomar* response, neither confirming nor denying the existence or nonexistence of such records. The fact of the existence or nonexistence of such records is itself currently and properly classified, as it could reveal clandestine CIA intelligence activities, sources, and methods. *Id.* at ¶ 19.

The CIA, which went above-and-beyond by conducting any search at all, properly limited its search for records to those "that would reveal an open, unclassified, or officially acknowledged affiliation or relationship between the CIA and Plaintiff." *See* Williams Dec. at ¶ 14. Plaintiff's request that the Court "order defendant to conduct a search for any and all responsive records to plaintiff's request and demonstrate that it employed search methods likely to lead to the discovery of records responsive to the request," ECF No. 1 at 2, "misunderstands the nature of a *Glomar* response, which narrows the FOIA issue to the existence of records *vel non*." *EPIC v. Nat'l Sec. Agency*, 678 F.3d 926, 934 (D.C. Cir. 2012) (quoting *Wolf v. CIA*, 473 F.3d 370, 374 n.4 (D.C. Cir. 2007). "When the agency takes the position that it can neither confirm nor deny the existence of the requested records, 'there are no relevant documents for the court to examine other than the affidavits which explain the

Agency's refusal.'" *Id.*; *see also Wheeler v. CIA*, 271 F. Supp.2d 132, 141 (D.C. Cir. 2003) ("the adequacy of a search is irrelevant to this *Glomar* response because the issue is whether the Agency has given sufficiently detailed and persuasive reasons for taking the position that it will neither confirm nor deny the existence or non-existence of any responsive records."). Here, as in *EPIC*, requiring the CIA to conduct a search and segregability analysis "would be a meaningless – not to mention costly – exercise." *EPIC*, 678 F.3d at 934.[2]

Likewise, Plaintiff's request that the Court order the CIA "to produce . . . a *Vaughn* index of any responsive records withheld under claim of exemption" is misplaced. ECF No. 1 at 3. "[A] *Vaughn* index is not required here, where it could cause the very harm that" the provisions cited by the CIA were intended to prevent. *EPIC*, 678 F.3d at 934 (quoting *People for the Am. Way Found. v. NSA*, 462 F. Supp.2d 21, 30 n.5 (D.D.C. 2006)).

## II. THE CIA's *GLOMAR* RESPONSE AND EXEMPTIONS CLAIMED

For the reasons discussed below, the CIA can neither confirm nor deny the existence or nonexistence of records that would reveal a classified association between the CIA and Plaintiff pursuant to FOIA Exemptions 1 and 3, and Privacy Act Exemptions (j)(1) and (k)(1).[3]

### A. FOIA Exemption 1

Exemption 1 "exempts from disclosure records that are 'specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense

---

[2] Although the CIA conducted searches related to Plaintiff's request of its own volition prior to issuing the *Glomar* response, courts have generally not held, or even implied, that such a search and analysis is *required*. *See EPIC*, 678 F.3d at 934 (citing *Larson v. Dep't of State*, 565 F.3d 857, 861-62 (D.C. Cir. 2009)).

[3] While Plaintiff did not challenge the CIA's *Glomar* assertion under Exemption (b)(3) in either his administrative appeal with the Agency or in his Complaint filed in this action, it is addressed here because it provides a separate and independent basis for justifying the CIA's *Glomar* response. Williams Dec. at ¶ 21 n.2.

or foreign policy,' and 'are in fact properly classified pursuant to such Executive order.'" *Ctr. for Constitutional Rights v. CIA*, 765 F.3d 161, 164 (2d Cir. 2014) (quoting 5 U.S.C. § 552(b)(1)). Here, Executive Order 13526 is the operative Executive Order that governs classification. Williams Dec. at ¶ 23. Consistent with sections 1.1(a) and 3.6(a) of Executive Order 13526, as an original classification authority, the CIA has determined that the existence or nonexistence of the requested records in Plaintiff's request is a currently and properly classified fact that concerns "intelligence activities (including covert action), [or] intelligence sources or methods" under section 1.4(c) of the Executive Order. Further, the CIA has determined that this information is owned by and is under the control of the U.S. Government, and the unauthorized disclosure of this information reasonably could be expected to result in damage to national security. *Id.* at ¶ 24. "Courts are to give deference 'to executive affidavits predicting harm to the national security, and have found it unwise to undertake searching judicial review.'" *ACLU*, 322 F. Supp.3d at 474 (quoting *Am. Civil Liberties Union v. Dep't of Justice*, 681 F.3d 61, 70 (2d Cir. 2012) ("*Dep't of Justice*")).

In accordance with section 1.7(a) of the Executive Order, the CIA's determination that the existence or nonexistence of the requested records is a classified fact has not been made to conceal violations of law, inefficiency, or administrative error; to prevent embarrassment to a person, organization, or agency; to restrain competition; or to prevent or delay the release of information that does not require protection in the interests of national security. *Id.* at ¶ 25. In most cases, upon receiving a FOIA request, the CIA will conduct searches for any responsive documents subject to FOIA in its holdings and provide the requester with all reasonably segregable, non-exempt information contained in those records. In this common scenario, the CIA's response – either to provide or not provide the records sought – serves to

confirm the existence or nonexistence of CIA records responsive to the FOIA request. In such a scenario, the fact that the CIA does or does not possess responsive records is, in and of itself, unclassified, even though the information contained within the records may be classified. *Id.* at ¶ 26.

However, given the CIA's mandate to collect and analyze foreign intelligence and to conduct counterintelligence, there are many instances in which the CIA cannot reveal whether or not it possesses responsive records because the mere confirmation or denial of the existence of responsive records would, in and of itself, reveal a classified fact: namely, whether the CIA has an intelligence interest in, or a clandestine connection to, a particular individual, group, subject matter, or activity. In those cases, the CIA asserts a *Glomar* response, because the existence or nonexistence of CIA records responsive to the request is a currently and properly classified fact, the disclosure of which reasonably could be expected to cause damage to the national security of the United States. Specifically, disclosure of such information could provide insight into the CIA's priorities, resources, and capabilities and could be used by terrorist organizations, foreign intelligence services, and other hostile adversaries to undermine CIA intelligence activities and attack the United States and its interests. *Id.* at ¶ 27.

A defining characteristic of the CIA's intelligence activities is that they are carried out through clandestine means, and therefore they must remain secret in order to be effective. In the context of FOIA, this means that the CIA must carefully evaluate whether its response to a FOIA request could jeopardize the clandestine nature of the Agency's intelligence activities or otherwise reveal previously undisclosed information about CIA sources, methods,

capabilities, authorities, interests, relationships with domestic or foreign entities, strengths, weaknesses, personnel, and/or resources. *Id.* at ¶ 28.

To maintain the effectiveness of the *Glomar* response, the CIA invokes the response consistently, in all cases where the existence or nonexistence of records responsive to a FOIA request is a classified fact, including instances in which the CIA does not possess records responsive to a particular request. If the Agency were to invoke a *Glomar* response only in cases in which it possesses responsive records, that response could be interpreted as an admission that responsive records exist and could have the effect of confirming classified information. *See Moore v. FBI*, 883 F. Supp.2d 155, 164 (D.D.C. 2012) (concluding CIA properly invoked a *Glomar* response for a first-party request because "[i]f a *Glomar* response is provided only when classified records are found, the response would in fact be useless because it 'would unsurprisingly be interpreted as an admission that classified response records exist'"). This practice would reveal the very information that the CIA must protect in the interest of national security. *Id*. at ¶ 29.

In this case, the CIA issued a *Glomar* response stating that it could neither confirm nor deny the existence or nonexistence of records that may reveal a classified connection between the CIA and Plaintiff. An acknowledgement confirming or denying the existence or nonexistence of such records would reveal classified intelligence information and jeopardize the clandestine nature of the Agency's intelligence activities and/or disclose information about the CIA's sources and methods. For example, if the CIA were to confirm the existence of responsive records, such response could reveal that the CIA had some type of involvement in, affiliation with, connection to, or intelligence interest in a particular individual – Plaintiff in this case – or a group, subject matter, or activity related to Plaintiff. On the other hand, if

the CIA denied having records responsive to Plaintiff's request, that response could reveal that the CIA did not have any type of involvement in, affiliation with, connection to, or intelligence in Plaintiff or a group, subject matter, or activity related to Plaintiff. *Id.* at ¶ 30.

In either case, confirmation or denial of the existence or nonexistence of such records would implicate sensitive information about the CIA's intelligence activities and sources and methods in a manner that would be reasonably expected to cause damage to national security. As a general matter, the CIA does not reveal whether it has or had involvement in, connection to, or intelligence interests in specific individuals and/or particular groups. Confirmation or denial of the existence or nonexistence of records responsive to Plaintiff's request would do precisely that, and doing so could reveal – among other things – sensitive information about the CIA's intelligence interests, activities, technical capabilities, and authorities. *Id.* at ¶ 31.

For similar reasons, the CIA does not reveal the identity of its human sources. Revealing the identity of a confidential source could expose Agency tradecraft, other human sources, and specific intelligence interests and activities. Human sources can be expected to furnish information to the CIA only when they are confident the CIA can and will do everything in its power to prevent the public disclosure of their cooperation. In the case of a person who has been cooperating with the CIA, official confirmation of that cooperation could cause the targets to take retaliatory action against that person or against that person's family or friends. It also places in jeopardy every individual with whom the cooperating individual has had contact. Thus, the indiscretion of one source in a chain of intelligence sources can damage an entire spectrum of sources. As such, confirming or denying the existence of records on a particular individual, like Plaintiff, reasonably could be expected to

cause damage to U.S. national security by indicating whether or not the CIA maintained any human intelligence sources related to an interest in the subject of the request. *Id.* at ¶ 32.

The Supreme Court has acknowledged the paramount importance of protecting intelligence sources for precisely the reasons detailed by the CIA:

> If potentially valuable intelligence sources come to think that the Agency will be unable to maintain the confidentiality of its relationship to them, many could well refuse to supply information to the Agency in the first place. . . . "The continued availability of [intelligence] sources depends upon the CIA's ability to guarantee the security of information that might compromise them and even endanger their personal safety."

*CIA v. Sims*, 471 U.S. 159, 175-76 (1985) (quoting *Snepp v. United States*, 444 U.S. 507, 512 (1980)); *see also Larson v. Dep't of State*, 565 F.3d 857, 864 (D.C. Cir. 2009) ("We 'accord substantial weight to an agency's affidavit concerning the details of the classified status of the disputed record because the Executive departments responsible for national defense and foreign policy matters have unique insights into what adverse affects [sic] might occur as a result of a particular classified record.'") (additional citations omitted).

For these reasons, the CIA has determined that confirming or denying the existence or nonexistence of records responsive to Plaintiff's request could reasonably be expected to cause damage to national security. Further, this information is currently and properly classified and is therefore exempt from disclosure under FOIA Exemption 1. *Id.* at ¶ 33.

### B. FOIA Exemption 3

Exemption 3 "permits the Government to withhold information from public disclosure provided that: (1) the information is 'specifically exempted from disclosure by statute'; and (2) the exemption statute 'requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue' or 'establishes particular criteria for

withholding or refers to particular types of matters to be withheld.'" *ACLU*, 322 F. Supp.3d at 474 (quoting *Dep't of Justice*, 681 F.3d at 72; 5 U.S.C. § 552(b)(3)).

Section 102A(i)(1) of the National Security Act of 1947, as amended, 50 U.S.C. § 3024(i)(1) (the "National Security Act") provides that the Director of National Intelligence (DNI) "shall protect intelligence sources and methods from unauthorized disclosure." Accordingly, the National Security Act constitutes a federal statute which "requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue." 5 U.S.C. § 552(b)(3). Under the direction of the DNI pursuant to section 102A of the National Security Act, as amended, and in accordance with section 1.6(d) of Executive Order 12333, the Director of the CIA is required to protect CIA intelligence sources and methods from unauthorized disclosure. Acknowledging or denying the existence or nonexistence of records reflecting a classified or otherwise unacknowledged connection between the CIA and Plaintiff would reveal information that concerns intelligence sources and methods – information protected under the National Security Act. Williams Dec. at ¶ 35.

The National Security Act is "a recognized withholding statute that protects 'intelligence sources and methods from unauthorized disclosure.'" *ACLU*, 322 F. Supp.3d at 475 (citing *Sims*, 471 U.S. at 167; *Florez v. CIA*, 829 F.3d 178, 183 (2d Cir. 2016)). "The Supreme Court gives even greater deference to CIA assertions of harm to intelligence sources and methods under the National Security Act . . . [b]ecause the purpose of national security exemptions to the FOIA is to protect intelligence sources before they are compromised and harmed, not after." *ACLU*, 322 F. Supp.3d at 475 (quoting *Wolf*, 473 F.3d at 377)).

Furthermore, section 6 of the CIA Act provides that the CIA shall be exempted from the provisions of any law which requires the publication or disclosure of the "organization or

functions of the Agency, or of the names, official titles, salaries, or numbers of personnel employed by the CIA." The CIA Act constitutes a federal statute that "establishes particular criteria for withholding or refers to particular types of matters to be withheld." 5 U.S.C. § 552(b)(3). As discussed above, confirming the existence or nonexistence of records on a particular individual, like Plaintiff, could reveal how CIA collects (or does not collect) certain information on particular subjects or individuals and/or could reveal information about the methods by which the Agency does (or does not) effectuate such collection, both of which pertain to intelligence collection – a function of the Agency. Therefore, the CIA has determined that confirming or denying the existence or nonexistence of records responsive to Plaintiff's request is protected from disclosure under the CIA Act. Williams Dec. at ¶ 36.

In contrast to Exemption 1, Exemption 3 does not require the CIA to identify and describe the damage to national security that reasonably could be expected to result should the information be disclosed. As set forth above, should anything other than a *Glomar* response be required of the CIA in this case, damage to national security could result. *Id.* at ¶ 37.

Accordingly, the fact of the existence or nonexistence of responsive records is exempt not only under Exemption 1, but also under Exemption 3 pursuant to the National Security Act and the CIA Act. Exemptions 1 and 3 apply independently and co-extensively to protect from disclosure in this case CIA's intelligence sources and methods, as well as functions of the Agency. *Id.* at ¶ 38; *see also Am. Civil Liberties Union v. Dep't of Defense*, 752 F. Supp.2d at 368-69 ("Because Exemption 1 justifies the CIA's decision to provide a *Glomar* response, the Court need not consider the applicability of Exemption 3.") (quoting *Wilner*, 592 F.3d at 68 ("Because defendants need only proffer one legitimate basis for invoking the *Glomar* response

and FOIA Exemptions 1 and 3 are separate and independent grounds in support of a *Glomar* response, we consider only the applicability of FOIA Exemption 3.") (additional citation omitted)).

### C. *Privacy Act Exemption (j)(1)*

Individuals' requests for access to records under the Privacy Act are processed under both the Privacy Act and FOIA. Privacy Act Exemption (j)(1) authorizes the Director of the CIA (DCIA) to exempt, via published regulation, any Agency system of records from the access and amendment provisions of subsection (d) of the Privacy Act. Williams Dec. at ¶ 39; *see also* 5 U.S.C. § 552a(j)(1). Pursuant to the general exemption authority granted by Privacy Act Exemption (j)(1), the DCIA exempted from the access provisions of the Privacy Act portions of all systems of records the CIA maintains that consist of, pertain to, or would otherwise reveal intelligence sources and methods. Williams Dec. at ¶ 40; *see also* 32 C.F.R. § 1901.62; *Wheeler*, 271 F. Supp.2d 132, 138 (D.D.C. 2003).

The CIA's regulation also provides that, in processing a Privacy Act request, "the Agency shall decline to confirm or deny the existence or nonexistence of any responsive records whenever the fact of their existence or nonexistence" is currently and properly classified under the relevant Executive Order governing classifications or where the records would be "revealing of intelligence sources or methods protected pursuant to section 103(c)(5) of the National Security Act of 1947." Williams Dec. at ¶ 41. Where records responsive to Plaintiff's FOIA request would reveal a classified or unacknowledged connection to the CIA, the Agency can neither confirm nor deny the existence or nonexistence of such records because to do so would tend to reveal a classified fact. Executive Order 13526 and the

National Security Act are designed to protect against disclosure in this instance, and this information is therefore exempt from release. *Id.* at ¶ 42.

For these reasons, the CIA has applied Privacy Act Exemption (j)(1) to currently and properly classified information. *Id.* at ¶ 43; *see also Pipko v. CIA*, 312 F. Supp.2d 669, 679 (D.N.J. 2004) ("[I]t is the very existence of these documents that would reveal classified information, that is, whether the CIA has gathered information on or from a particular individual.").

### *Privacy Act Exemption (k)(1)*

Privacy Act Exemption (k)(1), a corollary to FOIA Exemption 1, permits the head of any agency to promulgate rules exempting any system of records within the agency from disclosure if the system of records is subject to the provisions of 5 U.S.C. § 552(b)(1). In other words, information that is classified under criteria established by an Executive Order is exempt from disclosure pursuant to Privacy Act Exemption (k)(1) in conjunction with FOIA Exemption 1. The DCIA has claimed Privacy Act Exemption (k)(1) by promulgating 32 C.F.R. § 1901.63(a) (exempting classified information from the disclosure provisions under the Privacy Act). Williams Dec. at ¶ 44; *see also Wheeler*, 271 F. Supp.2d at 137.

Unauthorized disclosure of information revealing a classified or unacknowledged connection between Plaintiff and the CIA, or confirmation of a lack thereof, could reasonably be expected to cause serious damage to U.S. national security. Therefore, this information is currently and properly classified under Executive Order 13526 and is, therefore, exempt from disclosure under Privacy Act Exemption (k)(1). Williams Dec. at ¶ 45.

## **CONCLUSION**

For the foregoing reasons, the Court should grant summary judgment in Defendant's favor.

**DATED**:  Buffalo, New York, April 17, 2024.

TRINI E. ROSS
United States Attorney

BY:  S/SCOTT LEESON SROKA
Assistant U.S. Attorney
U.S. Attorney's Office
Western District of New York
138 Delaware Avenue
Buffalo, New York 14202
716-843-5831
scott.sroka@usdoj.gov